**ANTONIA M. APPS**
**REGIONAL DIRECTOR**
**Thomas P. Smith, Jr.**
**Alison T. Conn**
**Margaret Spillane**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**100 Pearl Street**
**Suite 20-100**
**New York, NY 10004-2616**
**(212) 336-0934 (Spillane)**
**spillanem@sec.gov**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>                         **Plaintiff,**<br><br>        **-against-**<br><br>**JOSEPH M. DUPONT,**<br>**SHAWN P. CRONIN,**<br>**STANLEY KAPLAN,**<br>**PAUL FELDMAN and**<br>**JARETT G. MENDOZA**<br><br><br>                         **Defendants.** | **COMPLAINT**<br><br>**23 Civ. 5565 (      )**<br><br><br>**JURY TRIAL DEMANDED** |

        Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

Defendants Joseph M. Dupont ("Dupont"), Shawn P. Cronin ("Cronin"), Stanley Kaplan

("Kaplan"), Paul Feldman ("Feldman") and Jarett G. Mendoza ("Mendoza") (collectively,

"Defendants"), alleges as follows:

## SUMMARY

1.      This case involves insider trading by Dupont, Cronin, Kaplan, Feldman and Mendoza in the securities of Portola Pharmaceuticals, Inc. ("Portola") in advance of the May 5, 2020 announcement of a tender offer by Alexion Pharmaceuticals, Inc. ("Alexion") to acquire Portola (the "Announcement").

2.      Dupont was a senior employee at Alexion and, beginning on or about January 30, 2020, he worked on the company's potential acquisition of Portola ("the Alexion-Portola Deal"). Dupont tipped Cronin – one of his closest friends – material nonpublic information about the Alexion-Portola Deal in breach of a duty of trust and confidence to Alexion.

3.      Cronin traded on the information that Dupont had tipped him, purchasing Portola stock and call options – including short-term, out of the money call options – ahead of the Announcement. In addition to trading for his own account, Cronin unlawfully provided the material nonpublic information he received from Dupont to his friend Kaplan, who then, in turn, unlawfully further passed the information to his friend and colleague, Feldman.

4.      Kaplan and Feldman each traded on the information to purchase Portola stock and call options, including short-term, out of the money call options, ahead of the Announcement. Kaplan and Feldman also unlawfully provided the material nonpublic information to several of their relatives and colleagues, who also purchased Portola securities ahead of the Announcement.

5.      Cronin further unlawfully tipped material nonpublic information about the Alexion-Portola Deal to his close friend Mendoza, who was also Dupont's close friend. Mendoza then traded on that information, purchasing Portola stock ahead of the Announcement.

6.      The flow of material nonpublic information is depicted below.



7.      Portola's stock price increased by over 130% on the day of the Announcement. Cronin, Kaplan, Feldman and Mendoza collectively profited by more than $2.3 million from their unlawful insider trading. Kaplan's and Feldman's successive tippees profited by approximately $1.7 million.

## VIOLATIONS

8.      By virtue of the foregoing conduct and as alleged further herein, Defendants have violated Sections 10(b) and 14(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b) and 78n(e)], and Rules 10b-5 and 14e-3 thereunder [17 C.F.R. §§ 240.10b-5 and 240.14e-3].

9.      Unless Defendants are restrained and enjoined, they will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

10.     The Commission brings this action pursuant to the authority conferred upon it by

Exchange Act Sections 21(d) [15 U.S.C. § 78u(d)] and 21A(a) [15 U.S.C. § 78u-1(a)].

11.     The Commission seeks a final judgment: (a) permanently enjoining Defendants from violating the federal securities laws and rules this Complaint alleges they have violated; (b) ordering Defendants Cronin, Kaplan, Feldman and Mendoza to disgorge all ill-gotten gains they received as a result of the violations alleged here and to pay prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; (c) ordering Defendants to pay civil money penalties pursuant to Exchange Act Section 21A(a) [15 U.S.C. § 78u-1(a)]; (d) permanently prohibiting Defendants from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and (e) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to Exchange Act Section 27 [15 U.S.C. § 78aa].

13.     Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

14.     Venue lies in this District under Exchange Act Section 27 [15 U.S.C. § 78aa]. Certain Defendants may be found in, are inhabitants of, or transact business in the Southern District of New York, and certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District. At all relevant times, the common stock

of Portola traded publicly on the Nasdaq Stock Market ("Nasdaq"), which is headquartered in New York, New York. Further, at all relevant times, Kaplan and Feldman both worked in Dutchess County, New York, where Feldman also resided.

## DEFENDANTS

15.     **Joseph M. Dupont**, age 44, resides in Rehoboth, MA. At all relevant times, Dupont was Vice President of Business Operations and Commercial Effectiveness at Alexion, and resided in North Dighton, MA. Dupont is currently employed at another public reporting company. Dupont is, and was at all relevant times, a reserve officer with the Dighton Police Department.

16.     **Shawn P. Cronin**, age 43, is a resident of Dighton, MA. At all relevant times, Cronin was a Sergeant in the Dighton Police Department. He became its Chief in August 2022.

17.     **Jarett G. Mendoza**, age 44, resides in North Dighton, MA. At all relevant times, he was employed as a Regional Sales Director for a public reporting company that sells medical devices.

18.     **Stanley Kaplan**, age 45, resides in Hopewell Junction, NY. Between January 2020 and approximately August 2020, he was living in Brooklyn, NY. At all relevant times, Kaplan was a medical doctor, worked at a hospital (the "Hospital") in Poughkeepsie, NY, and had additional part-time positions practicing in the Bronx and in Kingston, NY.

19.     **Paul Feldman**, age 48, resides in Poughquag, NY. At all relevant times, he was a medical doctor who also worked at the Hospital; he also owned a clinic with locations in the Hudson Valley area of NY.

## RELEVANT ENTITIES

20.     **Portola** was at all relevant times a Delaware corporation headquartered in San

Francisco, CA. Portola was a biopharmaceutical company that developed and commercialized

new drug treatments for hematologic diseases and inflammation. Portola's common stock traded

on the Nasdaq under the ticker "PTLA," and its options traded on multiple exchanges. Alexion's

tender offer and subsequent merger with Portola were completed on July 2, 2020.

21.     **Alexion** was at all relevant times a Delaware corporation headquartered in

Boston, MA, whose common stock was listed on the Nasdaq under the ticker "ALXN." Alexion

is a global biopharmaceutical company engaged in the research, development and marketing of

rare disease medications. In July 2021, Alexion was acquired by a foreign pharmaceutical

company whose ADRs[1] trade on the Nasdaq, and Alexion remains an independent subsidiary of

that entity.

## FACTS

## I.     BACKGROUND

### A.     Dupont Had a Duty of Trust and Confidentiality.

22.     In February 2018, Dupont joined Alexion as its Executive Director of U.S. and

Latin America Commercial Operations.

23.     Over the following years, Dupont worked his way up to the position of Vice

President of Business Operations and Commercial Excellence.

24.     At all relevant times, Dupont had been advised and acknowledged that the

possibility of a business combination between Alexion and Portola – and the related discussions

and due diligence – constituted nonpublic, confidential information, and that he had a duty not to

disclose that information.

25.     Alexion had multiple policies requiring its employees to keep sensitive

---

[1] An American Depositary Receipt ("ADR") is a security that represents shares of non-U.S.
companies that are held by a U.S. depositary bank outside the U.S.

information confidential, and prohibiting insider trading. As an Alexion employee, Dupont received, signed and acknowledged these policies.

26.     Alexion's "Policy Regarding Company Information and Transactions in Company Securities," prohibited insider trading and required Alexion employees not to disclose "material nonpublic information concerning another company obtained in the course and scope of your work with Alexion . . . to another person unless that person has a legitimate business need to know the information."

27.     The policy defined insider trading to include "communicating ('tipping')" "material nonpublic information regarding another company obtained in the official course and scope of employment (or other relationship) with Alexion to another person following which that person either buys or sells the securities of that company or advises others to do so." The policy provided examples of material nonpublic information, which included "merger or acquisition proposals or agreements or tender offers[.]"

28.     Dupont signed a copy of this policy when he was hired by Alexion in February 2018, acknowledging that he had received and reviewed it. Dupont received a copy of this policy approximately once every quarter, including in December 2019 and March 2020, as an attachment to a regular reminder of trading restrictions.

29.      Alexion's policies prohibiting the sharing of confidential information and insider trading were also reiterated in Alexion's Employee Handbook and Code of Ethics and Business Conduct, which Dupont also acknowledged receiving and agreed to abide by.

**B.      Relationships Among the Defendants and the Successive Tippees**

30.     At all times relevant to this Complaint, Dupont and Cronin were very close friends. Mendoza was also very close friends with both Dupont and Cronin during this period.

7

They all grew up in the area of Dighton, Massachusetts, and had known each other since childhood.

31.     At all relevant times, Dupont, Cronin and Mendoza lived within 4 to 6 miles of each other in the Dighton area, and spent significant time together. They socialized in person in a variety of ways: one-on-one, in a group of the three of them, with larger groups of friends and together with their families.

32.     During 2020, the year the events alleged in this Complaint took place, Dupont, Cronin and Mendoza also vacationed together several times, including trips one-on-one and in a group of the three of them. Dupont's family also took family vacations with Cronin's family and, separately, with Mendoza's family. Dupont and Cronin owned vacation properties near each other in the Madeira Beach, Florida area.

33.     Dupont, Cronin and Mendoza also spoke frequently by phone and communicated by text message, both one-on-one and in groups.

34.     At all relevant times, Cronin and Mendoza were aware that Dupont had a high-level position at Alexion, and that he was privy to sensitive commercial information in his role.

35.     At the time the insider trading took place, Cronin was a Sergeant with the Dighton Police Department, and Dupont, as a reserve officer, was subordinate to Cronin.

36.     At all relevant times, Cronin was friends with Kaplan, and their families socialized. Cronin and his family visited the Kaplan family in Brooklyn on or around February 22, 2020. After that visit, Kaplan saved Cronin's contact information.

37.     At all relevant times, Kaplan exchanged text messages and phone calls, including person-to-person instant messaging and video calling, with Cronin and, separately, with his relative who traded in Portola securities ("Kaplan Relative").

8

38.     At all relevant times, Kaplan and Feldman both worked at the Hospital. They were work colleagues and friends, with both a professional and social relationship. They had meetings at the Hospital, communicated by text and by phone, and socialized together outside of work. They also discussed investments and trading. Kaplan and Feldman occasionally texted in Russian together.

39.     At all relevant times, Feldman was work colleagues and had a personal relationship with an individual who was also employed at the Hospital ("Colleague 3").

40.     At all relevant times, Feldman communicated with Kaplan, Colleague 3 and his other successive tippees by text message and phone, including on platforms that provide for person-to-person instant messaging and video calling.

**C.      Alexion's Substantial Steps to Acquire Portola by Tender Offer**

41.     The Alexion Board of Directors ("Alexion Board") discussed a potential acquisition of Portola on December 5, 2019.

42.     By at least January 31, 2020, Alexion staff, including Dupont, began conducting initial due diligence of Portola.

43.     On February 27, 2020, Alexion executives conveyed to Portola executives, verbally and in a non-binding letter, Alexion's interest in acquiring Portola for $18.00 per share, payable in cash and subject to a variety of conditions.

44.     Between March 7 and March 17, 2020, Alexion and Portola executives further discussed the proposal, Alexion involved or engaged outside legal counsel and an investment banker to assist in the potential deal, and Alexion's senior management discussed the potential acquisition of Portola with the Alexion Board.

45.     On April 1, 2020, Alexion submitted a revised non-binding indication of interest

to acquire Portola for $18.00 per share of Portola common stock, payable in cash. The proposal indicated that Alexion would agree to standstill restrictions in exchange for Portola granting Alexion an exclusivity period expiring on May 6, 2020.

46.     On April 4, 2020, the companies finalized and entered into a confidentiality agreement.

47.     From early April 2020 through May 4, 2020, Alexion and its professional advisors engaged in additional due diligence of Portola, and the companies and their representatives exchanged draft merger agreements and discussed related issues. For example, on April 8, 2020, Portola leadership made a commercial due diligence presentation to Alexion staff, which Dupont attended.

48.     On April 30, 2020, the Alexion Board unanimously adopted formal resolutions approving the tender offer and merger agreement.

49.     On May 4, 2020, the Portola Board met and approved the merger agreement.

50.     On May 5, 2020, the parties signed the merger agreement.

## II.     DUPONT TIPS CRONIN, THEN CRONIN AND KAPLAN UNLAWFULLY PASS ON THE INFORMATION, AND CRONIN, KAPLAN AND FELDMAN UNLAWFULLY TRADE.

### A.     Dupont is Entrusted with Material Non-Public Information about the Alexion-Portola Deal, and Regularly Communicates with Cronin.

51.     On approximately January 30, 2020, Dupont's supervisors at Alexion asked him to work on the Alexion-Portola Deal. Dupont was tasked with helping to analyze whether, and how, Alexion could better execute on the commercialization of one of Portola's drugs.

52.     From January 31 until at least May 5, 2020, when the acquisition was announced, Dupont had high-level involvement in the Alexion-Portola Deal.

53.     From January 31 through May 2020, Dupont received and acknowledged

transaction-specific notices that all information about the Alexion-Portola Deal must remain strictly confidential.

54.     Dupont was significantly involved in the commercial due diligence for the possible deal. Dupont worked with other Alexion managers to summarize the due diligence in reports and recommendations to executives and Alexion's Board.

55.     Dupont received regular emails concerning the acquisition and was involved in numerous meetings during which Alexion staff discussed and prepared for significant milestones in the deal progression.

56.     Because Dupont was also expected to have responsibility for the integration of Portola into Alexion after the acquisition, he was regularly informed of the expected date that the acquisition would be announced.

57.     Meanwhile, Dupont and Cronin were in regular contact and often physically together in the same location. For example, when Dupont first learned about the Alexion-Portola Deal, he was vacationing in Miami with Cronin and Mendoza. And, during President's Day weekend in mid-February 2020, while Dupont was involved in preparing a senior management presentation to the Alexion Board of Directors, Dupont and Cronin were together with their families in Vermont.

### B.     Dupont Tips Inside Information to Cronin; Cronin Passes it to Kaplan, Who Passes it to Feldman; Cronin, Feldman and Kaplan all Trade

58.     Dupont's awareness of inside information, the timing of his contact with Cronin, text messages between Cronin and Kaplan and Kaplan and Feldman, the timing of the trades, and the unusual and suspicious pattern of the trades show that Dupont tipped Cronin, and that Cronin, Kaplan and Feldman were using the information they knew about the Alexion-Portola Deal to trade in Portola securities.

59.     At the beginning of April 2020, work on the Alexion-Portola Deal intensified. Dupont was invited to multiple deal-related meetings, including the first commercial due diligence meeting with Portola, scheduled for April 8, and weekly due diligence team meetings for the next month.

60.     In April 2020, Dupont and Cronin met frequently in person, and were in regular communication by text and phone.

61.     On April 3, 2020, Dupont received an email with a detailed timeline of the anticipated progress of the Alexion-Portola Deal. The timeline highlighted that the Alexion Board would vote on the transaction on April 30 and that the Announcement would take place on May 4, 2020.

62.     On the same day, Dupont received a notice of elevated trading restrictions and confidentiality for the Alexion-Portola Deal. The notice instructed Dupont and other recipients that "[g]iven the stage of negotiations" between the companies, they should continue to refrain from trading in Portola securities, and also refrain from trading in Alexion securities. The notice also reminded recipients, among other things, to "continue to maintain the secrecy of [the Alexion-Portola Deal] at all times."

63.     On April 8, 2020, Dupont participated in a commercial due diligence call with high level leadership from the companies, including both Alexion's and Portola's CFO.

64.     The same evening, Cronin and Dupont spoke on the phone for approximately 20 minutes.

65.     Later that evening, at 7:49 p.m., Cronin texted Kaplan: "Good evening, sir. If you need something to take your mind off of the everyday battle, remember that stock I told you about? Good time to buy."

66.     Within the next hour, Cronin opened a new brokerage account, transferred $10,000 into it, and placed an order to purchase 1394 shares of Portola stock. His order was executed the following day.

67.     Before this purchase, Cronin had never purchased Portola stock (or any other Portola securities) before.

68.     On April 15, 2020, at approximately 9:30 a.m., Cronin placed a short call to Kaplan.

69.     At around the same time, Kaplan transferred $5,000 into a brokerage account and shortly thereafter purchased Portola stock.

70.     Before this stock purchase, Kaplan had never purchased Portola stock (or any other Portola securities) before.

71.     No later than approximately 10:00 a.m. on April 15, Dupont was informed that an Alexion Board discussion concerning the potential merger was scheduled for about April 23, 2020.

72.     Between April 15 and April 22, Dupont played a significant role in Alexion senior management's preparations for the discussion about the Alexion-Portola Deal at the upcoming Board discussion. Dupont received a copy of the draft presentation for the meeting, which concluded that Portola represented a "compelling opportunity to immediately diversify & generate revenue," and recommended that Alexion "[p]roceed to binding offer and continue due diligence/commercial planning to ensure readiness for Day 1."

73.     On April 22, 2020, after an Alexion-Portola Deal integration team call, Dupont received an email with a post-announcement Integration Plan attached. The email, and subsequent replies, emphasized the date of May 4, 2020, when the announcement was expected

to take place.

74.     On the same day, April 22, Dupont and Cronin spoke on the phone several times.

75.     On April 22, Cronin initiated a transfer of $5,000 more into his brokerage account.

76.     On the morning of April 23, 2020, at around 7:45 a.m., Dupont texted Cronin that he had meetings that morning.

77.     On April 23, at approximately 10:00 a.m., Cronin purchased more Portola stock.

78.     That day, Dupont had several calls with Alexion staff, including one of his bosses, and spoke with Cronin by phone several times.

79.     On April 23 at around 1:30 p.m., Kaplan transferred more funds into a brokerage account and, the next day, purchased additional Portola shares.

**C.     As They Receive More Detailed Inside Information, Cronin, Kaplan and Feldman Engage in Options Transactions to Maximize the Profitability of their Insider Trading**

80.     On the afternoon of April 23, 2020, Feldman began executing Portola options transactions. While Feldman had some history in trading Portola securities, he had never engaged in Portola options transactions prior to this date.

81.     On or around April 23, Cronin and Kaplan began discussing trading in Portola stock call options.

82.     A stock option, commonly referred to as an "option," gives its purchaser/holder the option to buy or sell shares of an underlying stock at a specified price (the "strike price") before a specified time (the "expiration"). Options are generally sold in "contracts," which give the option holder the opportunity to buy or sell 100 shares of an underlying stock. If the holder does not exercise the option prior to the expiration date, the option expires as worthless.

83.     A "call" option gives the purchaser/holder of the option the right, but not the

14

obligation, to purchase a security at a specified strike price prior to expiration. Generally, the buyer of a call option anticipates that the price of the underlying security will increase prior to expiration. If the call option's strike price is above the price at which the underlying stock is trading, the call option is considered to be "out of the money," because it would be unprofitable to exercise the call and pay more for the stock than the price for which it could be obtained in the market. Conversely, if the strike price is below the then-current market price, the call is considered to be "in the money," because one could exercise the option, obtain the stock at the strike price, and then sell it at the higher market price for a profit. For a given expiration month, out of the money options are typically cheaper to buy than those that are in the money.

84.     These principles applied to Portola call options in April and early May 2020. That is, it was generally cheaper to buy out of the money Portola call options, especially if the expiration date within the short-term, *i.e.* in mid-May or June, giving the stock less time to increase to meet the strike price.

85.     In April 2020, Feldman was a sophisticated trader with experience trading in stock options. In April 2020, Kaplan had some experience in securities trading but had not previously traded in options, and did not have access to options trading in his brokerage accounts.

86.     As Kaplan was providing Feldman with information from Cronin concerning the Alexion-Portola Deal, Feldman began providing Kaplan with guidance on options trading, and specifically with respect to trading Portola options. Feldman sent Kaplan screenshots of his trades and explained strategies for profitable stock option trading.

87.     In April 2020, Cronin had little experience with the market and securities trading. He was unfamiliar with trading in stock options and did not have access to options trading in his

brokerage account.

88.     As Cronin shared information with Kaplan, Kaplan also began to advise Cronin about stock options trading, often based on the guidance he had received from Feldman.

89.     From April 23, 2020 through May 3, 2020, Dupont and Cronin exchanged at least 30 phone calls.

90.     From April 23 through May 1, 2020, Kaplan and Feldman spoke by phone at least once on most days. They also exchanged at least 70 text messages.

91.     From April 23 through May 4, 2020, Cronin and Kaplan exchanged at least ten phone calls. They also exchanged at least 100 text messages.

92.     On April 23, 2020, at around 3:26 p.m., Feldman texted Kaplan: "I just bought another PTLA bull spread." He attached a screenshot of his transaction, such that Kaplan could see Feldman's options transaction in Portola.

93.     A bull spread or bull call spread is an options transaction that involves buying call options with a lower strike price and selling call options with the same expiration but a higher strike price. The transaction is profitable when the stock has a limited increase in its price, and is cheaper than purchasing only the lower strike price option.

94.     At around 3:30 p.m. and 4:10 p.m., Cronin and Kaplan exchanged brief phone calls.

95.     At around 4:15 p.m., Kaplan texted Feldman's Portola options transaction screenshot to Cronin. The screenshot had Feldman's user name on it, and Kaplan texted Cronin: "This is what he is doing."

96.     Kaplan then made a brief call to Feldman.

97.     On April 24, 2020, beginning around 9:30 a.m., Feldman entered orders for more

Portola options transactions. These orders included additional bull spreads as well shorter-term call options with a strike price of $7.50 and a May 15 expiration date.

98.     That day, April 24, Feldman and Kaplan planned to meet in person at the Hospital shortly after 11:00 a.m.

99.     The next morning, April 25 (a Saturday), Kaplan and Cronin spoke by phone for about 15 minutes.

100.    On the afternoon of April 25, Kaplan texted Feldman with a "hypothetical question" about which options series would be more profitable. Feldman responded: "…It depends on how confident your event occurs and the nature of the event." Kaplan replied: "Ok. high confidence event." Feldman responded: "If there is a buyout even at a specified price, the calls will equilibrate to that price (not gonna go above it)[.]" Feldman then advised Kaplan that he could buy the May option series – *i.e.*, the option with a shorter expiration date and thus a shorter time by which the underlying stock price would need to rise for the option to be profitable – "if you are super confident[.]" Kaplan responded with a wink emoji: "☺"

101.    On April 26, after 6:00 p.m., Kaplan texted Feldman questions about one of Alexion's products, noting that it was "related to what we discussed yesterday." Feldman replied: "alexion is buying... P___?" – a furtive reference to Portola. Kaplan responded, in Russian, "Yes." Feldman replied: "I'm gonna owe you big." Kaplan responded with a smile emoji: "☺" Later in the text chain, Feldman advised: "After news hits, sell and go on to the next."

102.    Also on April 26, Cronin and Kaplan texted each other to discuss their efforts to get permission from their broker-dealers to trade options in their accounts. Kaplan texted Cronin that he hoped the approvals would come "before Friday" – *i.e.*, the last trading day before the

expected May 4 announcement.

103.    On April 27, 2020 (a Monday), around 8:00 a.m., Dupont received additional

documents confirming that the Announcement would go forward on May 4.

104.    On the morning of April 27, Kaplan transferred $4,000 into a second brokerage

account, which had been dormant since May 2019, and purchased Portola call options at a strike

price of $7.50 and May 15 expiration. He also transferred $14,000 into a third brokerage

account.

105.    On April 27, Feldman began to close out the Portola call options he sold in his

bull spreads the prior week, and purchased more call options. These purchases included more

short-term call options with May 15 and June 19 expirations, but with a higher strike price of

$10. Feldman also purchased 15,000 Portola shares.

106.    On April 27, Portola's stock price opened at $7.00, traded at a high of $7.77 and

closed at $7.76.

107.    At around 8:30 p.m. the evening of April 27, Cronin called Kaplan, and they

spoke for about 8 minutes.

108.    On the morning of April 28, 2020, at around 6:30 a.m., Dupont texted Cronin that

he was scheduled to have an "8 hour telecom today." Dupont later received a copy of the

approved presentation recommending the Portola acquisition to the Alexion Board, which he had

helped to prepare.

109.    Also on the morning of April 28, Kaplan ordered additional Portola call options in

the third brokerage account, and later that day purchased Portola call options with a strike price

of $7.50 and a May 15 expiration.

110.    Feldman also engaged in additional Portola securities transactions on April 28. He

purchased more shares, closed out the short leg of more of his bull spreads, and bought more Portola call options, including short-term out of the money call options.

111.    On April 28, at 12:54 p.m., Feldman texted Kaplan, referencing the "announcement May 4th."

112.    Between approximately 12:00 p.m. and 1:00 p.m. on April 28, Dupont and Cronin exchanged multiple short phone calls.

113.    Shortly after 2:00 p.m., Cronin and Kaplan spoke by phone for about 13 minutes, and texted each other as Cronin attempted to purchase PTLA options.

114.    Shortly after 3:00 p.m. on April 28, Cronin purchased Portola call options with a strike price of $7.50 and May 15 expiration. Over the next two days, he tried to purchase additional call options, but his orders were not filled.

115.    On the morning of April 29, 2020 Dupont and Cronin texted each other, and made plans to meet at Dupont's home around 9:30 a.m.

116.    On the morning of April 29, Feldman closed out the remaining short legs of his bull spreads and purchased additional short-term out of the money Portola call options.

117.    On April 29, Cronin and Kaplan again spoke by phone, and they texted each other about potential Portola options purchases.

118.    At around 2:30 p.m. on the afternoon of April 29, Feldman texted Colleague 3: "Buy 50 more PTLA [Portola's ticker symbol]… After the buyout you can sell it all… You'll be on margin by 1000 but that's ok. It's only until next week."

119.    On April 29 and 30, 2020 Feldman sent Colleague 3 additional texts referencing an expected "PTLA event" "next week."

120.    On April 30 and May 1, 2020, both before and after the Alexion Board

unanimously adopted formal resolutions approving the transaction, Dupont attended meetings where the May 4 Announcement date was confirmed.

121.    On May 1, Cronin, Kaplan and Feldman all purchased more call options. Feldman and Kaplan each bought a large volume of May 15 call options with a strike price of $10 – 300 and 351 contracts each, respectively. That day, Portola's stock price had opened at $6.92 per share, traded at a high of $7.17 and closed at $7.04.

122.    On the evening of May 1, Feldman texted Kaplan: "Hopefully Monday is a big day. It's supposed to be Monday right?"

123.    On the morning of May 3, Dupont and Cronin spoke by phone at least three times.

124.    By the afternoon of May 3 at the latest, Dupont had learned that the Announcement was postponed.

125.    On the morning, Monday, May 4, Dupont received an email reiterating the confidentiality policy and trading restrictions, which indicated that the parties were still working toward an imminent announcement.

126.    On May 4, both Cronin and Kaplan bought more May 15 call options at a strike price of $10.00. That day, Portola's stock opened at $7.00, traded at a high of $7.77, and closed at $7.76.

127.    By the evening of May 4 at the latest, Dupont was notified that the Announcement would take place the next morning, on May 5.

128.    The table below shows the type, net quantity and purchase dates of Portola securities Defendants Cronin, Kaplan and Feldman purchased from April 8, 2020 through May 4, 2020.

| Defendant | Portola Security | Quantity | Purchase Dates |
|-----------|------------------|----------|----------------|
| Cronin | PTLA stock | 2094 shares | April 9; April 23 |
| | PTLA May 15 2020 7.5 Call Option | 30 contracts | April 28 |
| | PTLA Sep 18 2020 10.0 Call Option | 15 contracts | May 1 |
| | PTLA May 15 2020 10.0 Call Option | 15 contracts | May 4 |
| | | | |
| Kaplan | PTLA stock | 1,013.4 shares | April 15; April 24; April 29; May 4 |
| | PTLA May 15 2020 7.5 Call Option | 76 contracts | April 28; April 30 |
| | PTLA Sep 18 2020 10.0 Call Option | 4 contracts | April 30 |
| | PTLA May 15 2020 10.0 Call Option | 516 contracts | May 1; May 4 |
| | | | |
| Feldman | PTLA stock | 17000 shares | April 27; April 28 |
| | PTLA Jan 15 2021 7.5 Call Option | 220 contracts | April 23; April 24; April 28 |
| | PTLA Jan 15 2021 10.0 Call Option | 100 contracts | April 27 |
| | PTLA Jun 19 2020 12.5 Call Option | 200 contracts | April 27 |
| | PTLA May 15 2020 7.5 Call Option | 200 contracts | April 29 |
| | PTLA May 15 2020 10.0 Call Option | 300 contracts | April 27; April 28; April 29 |
| | PTLA Jun 19 2020 7.5 Call Option | 300 contracts | April 27; May 1 |
| | PTLA Jun 19 2020 10.0 Call Option | 735 contracts | April 27; April 29; May 1 |

129.    On May 5, at approximately 7:00 a.m., Portola and Alexion issued the Announcement: a joint press release announcing the commencement of the tender offer and merger agreement.

130.    On May 5, after the Announcement of the tender offer was released, Portola's stock price rose to a high of $17.91, and closed at $17.85, an increase of 130% over the prior day's closing price.

131.    Within minutes after the acquisition announcement, Feldman texted Kaplan: "It happened! 18/share." Within the next minute, Kaplan texted Cronin, "Dude!"

132.    Cronin, Kaplan and Feldman all began selling their Portola securities later that day.

133.    Feldman sold all of his Portola securities by 9:40 a.m. on May 5.

134.    Kaplan sold all his Portola options on May 5, and sold his Portola stock the next day.

135.    Cronin began selling his Portola securities on May 5, and sold his position by the end of June, 2020.

## III.    KAPLAN AND FELDMAN UNLAWFULLY TIP INFORMATION TO SUCCESSIVE TIPPEES WHO THEN TRADE.

136.    Kaplan and Feldman also unlawfully passed the information they received about the Alexion-Portola Deal to their relatives and colleagues in the expectation that the relatives and colleagues would trade. Some of their trades are similar to trades that Kaplan or Feldman were executing at or around the same time.

### A.    Kaplan Relative

137.    From about April 26 through May 1, 2020, Kaplan texted one of his relatives ("Kaplan Relative") – who had never invested in Portola – with instructions to buy Portola call options. Kaplan and Kaplan Relative also spoke by phone several times.

138.    Kaplan advised Kaplan Relative to transfer funds into Kaplan Relative's brokerage account and instructed the relative how to invest in options.

139.    On April 27, 2020, Kaplan Relative transferred $5,000 into their account.

140.    Kaplan Relative began attempting to buy Portola call options on April 28, 2020, and eventually, on May 1, 2020, purchased 150 May 15 call options with a strike price of $10.

141.    Kaplan Relative sold all their Portola call options on the morning of the Announcement.

### B.    Feldman Relatives 1 and 2

142.    On April 24, 27, and 30, Feldman exchanged phone calls with one of his relatives ("Feldman Relative 1"), who shares a home with another of Feldman's relatives ("Feldman Relative 2") and trades in Feldman Relative 2's brokerage account.

143.    That account, which had not previously purchased Portola securities, purchased

Portola stock on April 24 and May 4.

144.     The Feldman Relative 2 account sold its entire Portola position shortly after the Announcement.

**C.     Colleague 1**

145.     Feldman also passed information to a medical doctor who was also associated with the Hospital and had a personal and professional relationship with Feldman ("Colleague 1").

146.     Colleague 1 had a history of trading in Portola, but had not invested in Portola options since June 2017.

147.     On April 23, 2020, at around 4:30 p.m., Colleague 1 and Feldman spoke by phone.

148.     On April 24, Colleague 1 purchased large quantities of Portola stock and call options in several different series, including 800 June 19 call options contracts with a $12.50 strike price and 500 June 19 call options contracts with a $10 strike price.

149.     On May 1, Colleague 1 bought additional call options and 1500 shares of Portola stock.

150.     Colleague 1 and Feldman exchanged frequent text messages, including multiple messages on the days that Colleague 1 purchased Portola securities.

151.     On the morning of the Announcement, Colleague 1 sold their entire Portola position.

152.     That morning, Feldman texted Colleague 3 that Feldman was also texting with Colleague 1 – whom Feldman described as one of his "buds." Feldman told Colleague 3 that Colleague 1 "[b]et everything [they] owned" and made so much money on the Portola trade that Colleague 1 was "gonna quit [their] job."

23

### D.      Colleague 2

153.    Feldman passed the information to another colleague who was also a medical doctor at the Hospital ("Colleague 2").

154.    Feldman and Colleague 2 discussed investments together, and Colleague 2 made investments pursuant to information Feldman provided.

155.    Colleague 2 and Feldman exchanged multiple text messages from April 24 through April 29, and on the day of the Announcement.

156.    Colleague 2 purchased Portola stock on April 27 and 29, and sold it on May 5, 2020, several hours after the Announcement.

157.    Colleague 2 had never invested in Portola stock before April 27.

### E.      Colleague 3

158.    As described in paragraphs 118 and 119, Feldman passed Colleague 3 information about the Alexion-Portola Deal. Colleague 3 purchased Portola securities while aware of and using that information.

159.    Colleague 3 purchased Portola stock on three dates before the Announcement: April 24, April 29 and May 4.

160.    Colleague 3 sold their Portola position on May 5, 2020, shortly after the Announcement.

### F.      Colleague 4

161.    Feldman also passed information to a nurse who was, at the time, employed at the Hospital ("Colleague 4").

162.    On April 27, 2020, having never previously purchased Portola securities, Colleague 4's account purchased Portola stock.

163.    Feldman and Colleague 4 exchanged frequent text messages, often sending

multiple messages within a day, including the days leading up to Colleague 4's April 27 Portola stock purchase.

164.    Colleague 4 sold their Portola securities on May 5, 2020, shortly after the Announcement.

165.    In approximately August 2020, Colleague 4 was hired at Feldman's clinic.

## IV.    CRONIN UNLAWFULLY PASSES INFORMATION TO MENDOZA AND MENDOZA UNLAWFULLY TRADES

166.    On approximately April 30, 2020, Dupont and Mendoza, along with their families, drove to the Madeira Beach, Florida area to vacation together.

167.    On the evening of May 3, 2020, while in Florida, Dupont and Mendoza and their families went to a restaurant near the beach.

168.    Later that evening, Mendoza placed a call to Cronin. At or around the same time as he called Cronin, Mendoza opened a brokerage account and ordered a transfer of $25,000 into it.

169.    Early the next morning, May 4, 2020, Cronin and Mendoza spoke on the phone for approximately 30 minutes. At or around the same time as this call, Mendoza purchased Portola stock.

170.    Later in the afternoon of May 4, Cronin and Mendoza had another phone call. Again, at approximately the same time as this phone call, Mendoza purchased additional Portola stock.

171.    In total, on May 4, Mendoza purchased 3561 shares of Portola stock.

172.    Mendoza began selling his Portola stock on the morning of the Announcement, and had sold his entire position by the end of June 2020.

## V.      DEFENDANTS' ILL-GOTTEN GAINS

173.      The approximate dollar amounts of each trading Defendant's Portola stock and

options purchases between April 8, 2020 and May 4, 2020, profits arising from selling those

Portola securities, and resulting rates of return are listed in the chart below.[2]

| Defendant | Purchase Cost | Profit | Rate of Return |
|---|---|---|---|
| Cronin | $19,500 | $72,000 | 370% |
| Mendoza | $25,000 | $38,600 | 155% |
| Kaplan | $27,100 | $472,100 | 1,742% |
| Feldman | $317,800 | $1,730,800 | 545% |

174.      The rates of return for Cronin, Kaplan and Feldman include both their stock and

options trading. Kaplan's and Feldman's rates of return reflect the significant quantities of

inexpensive, short-term, out of the money Portola options they purchased after learning of the

Alexion-Portola Deal, as alleged above.

175.      Kaplan's and Feldman's relatives and colleagues also profited from their

purchases of Portola securities between April 8 and May 4, 2020, as reflected in the chart below.

| Successive Tippee | Purchase Cost | Profit | Rate of Return |
|---|---|---|---|
| Kaplan Relative | $3,500 | $112,000 | 3,172% |
| Feldman Relatives 1 and 2 | $215,100 | $318,900 | 148% |
| Colleague 1 | $198,500 | $1,276,900 | 643% |
| Colleague 2 | $10,000 | $14,000 | 142% |
| Colleague 3 | $1,900 | $3,000 | 152% |
| Colleague 4 | $1,500 | $2,100 | 138% |

176.      As with Kaplan and Feldman, the rates of return for Kaplan Relative, Feldman

Relatives 1 and 2, and Colleague 1 reflect the large quantity of inexpensive, short-term, out of

the money Portola options they purchased after learning of the Alexion-Portola Deal, as alleged

---

[2] Figures shown in both charts on this page are approximate and rounded.

above.

## VI.   AFTER THE ANNOUNCEMENT, KAPLAN AND FELDMAN SEEK MORE INSIDE INFORMATION FROM THEIR "MOLE" AND CRONIN SEEKS TO PROVIDE IT.

177.    On May 6, 2020, as Kaplan and Feldman exulted in their profits, Feldman asked Kaplan whether he would have been so bold in purchasing Portola options if Feldman had not provided him with advice. Kaplan texted: "I was thinking of doing options as soon as I heard about the info, that's why I called you. I wish I had a way of putting more money into the account faster."

178.    On May 13, 2020, Colleague 3 texted Feldman, in frustration about recent losses in their investment portfolio: "I wanna MAKE money…Not lose it…I need more inside information[.]"

179.    On May 15, 2020, after Kaplan noted to Feldman that a different stock had increased in price 400% after a news announcement, Feldman replied: "This shit happens every day bro . . . Knowing of a buyout or any news beforehand is gols [*sic*]." Kaplan: "Yup[.] Kaplan continued, in Russian: "Let's hope our golden goose will continue laying golden eggs!" Feldman responded, in English: "We just have to be patient[.]"

180.    Cronin and Kaplan also continued to text and talk on the phone about stocks and investments after the Announcement.

181.    On May 20, 2020, Feldman texted Kaplan: "You think ALXN is gonna go up in July? There's rumor that they themself [*sic*] will be bought. I hope your mole gives us a clue."

182.    On May 22, 2020, Kaplan and Cronin texted about Alexion call options, and Cronin told Kaplan that he would "do some research" the following weekend.

183.    On May 23, 2020, Feldman texted Kaplan: "All we need is a little bit of luck. Having golden goose definitely doesn't hurt[.]" Kaplan replied, in Russian: "I am expecting a

report from Stierlitz soon[.]" Stierlitz was a Soviet-era super-spy character from a popular Russian book series.

184.    On May 24, 2020, Kaplan again texted Cronin about their "equity of interest." Cronin said he would "do some research. Haven't had time to read up. . . I will let you know what I see in the articles[.]"

185.    On the morning of Monday, May 26, 2020, Cronin told Kaplan, "I was unable to read up on that info. Sorry. I will this week, however."

186.    Cronin called Dupont later that day, and they made plans over text messages to meet that evening.

187.    Around 9:30 p.m. that evening, Cronin texted Kaplan: "Read a lot of material tonight[.]" Kaplan replied, "What have you learned?" Cronin responded, "Let's chat tomorrow if you're available[.]"

188.    On June 23, 2020, Feldman texted Kaplan, stating that they needed to "decide on ALXN in the next 2 days." Kaplan responded, "Yeah, I'll reach out to my goose[.]" Kaplan later texted Cronin and asked him about the "game plan" for buying Alexion call options.

189.    Around 8:00 a.m. the next morning, June 24, 2020, Cronin then texted Dupont, and asked him several times to meet that day, but Dupont could not meet. At around 11:00 a.m. that morning, Cronin texted Kaplan, "It's going to be impossible for me to see my buddy until the weekend."

190.    During the afternoon of June 24, Cronin continued to try to arrange to meet Dupont. Dupont said that he was very busy with "the most important stuff in the company." Cronin replied, "Obviously, if I can do anything for you, I will. I just don't know if you want me on those calls. LOL[.]" Cronin and Dupont met later that evening.

191.    The night of June 24, 2020, at around 9:00 p.m., Cronin and Kaplan spoke on the phone. Two minutes later, Kaplan texted Feldman: "Do you have a second? I just heard from my asset."

192.    The next month, on or about July 31, 2020, one of the broker-dealers that maintained Kaplan's brokerage accounts contacted Kaplan to ask about his Portola trading. Kaplan claimed that his Portola options trades were based on earnings releases, and denied any connection to the companies he invested in. Kaplan called Feldman shortly after the call with the broker-dealer.

193.    A few weeks later, around August 14, 2020, Kaplan and Feldman spoke by video call. Feldman then texted with Colleague 3 about Feldman's call with Kaplan. Feldman told Colleague 3 that Kaplan "thinks he's going to jail for ptla" because of "inside info etc[.]" Feldman noted that his own broker-dealer had not called him, even though "[he] and [Colleague 1] made way more than [Kaplan] did." Feldman continued: "I got a good tip. No one called me when I lost a ton of $ on [a prior investment.] . . . So f[***] them all. The world isn't fair… We use any edge we can get…"

### FIRST CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
### (ALL DEFENDANTS)

194.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 193.

195.    At all relevant times, Dupont owed a duty of trust and confidence to maintain the confidentiality of material nonpublic information concerning the Alexion-Portola Deal and to refrain from communicating that information to others without a corporate purpose.

196.    Dupont tipped his close friend Cronin with material nonpublic information about

29

the Alexion-Portola Deal in violation of the duty he owed.

197.    Dupont knew, consciously avoided knowing, or was reckless in not knowing that the information he tipped was material and nonpublic and that he was breaching his duty by disclosing material nonpublic information to Cronin.

198.    Dupont received a personal benefit from his tip of material nonpublic information to Cronin, including the benefit of providing a gift of inside information to Cronin, with whom he had a close personal relationship.

199.    Dupont also knew, consciously avoided knowing, or was reckless in not knowing that the information he communicated would be used in securities trading.

200.    Cronin knew, consciously avoided knowing, or was reckless in not knowing that Dupont disclosed material nonpublic information to him in breach of a duty of trust and confidence for personal benefit.

201.    Cronin bought Portola stock and options based on material nonpublic information that he received from Dupont. Cronin knew, consciously avoided knowing, or was reckless in not knowing that the information was material and nonpublic. Cronin used this inside information in conducting his trades, and it was a significant factor in his decision to trade.

202.    Cronin unlawfully communicated to Kaplan and Mendoza material nonpublic information that he received from Dupont. Cronin also knew, consciously avoided knowing, or was reckless in not knowing that the information he communicated would be used in securities trading.

203.    Kaplan bought Portola stock and options based on material nonpublic information that he received from Cronin despite knowing, consciously avoiding knowing, or being reckless in not knowing, that the information was material and nonpublic. Kaplan knew, consciously

avoided knowing, or was reckless in not knowing that the material nonpublic information was disclosed in breach of a duty of trust and confidence for personal benefit. Kaplan used this inside information in conducting his trades, and it was a significant factor in his decision to trade.

204.    Kaplan unlawfully communicated to Feldman and Kaplan Relative material nonpublic information that he received from Cronin. Kaplan also knew, consciously avoided knowing, or was reckless in not knowing that the information he communicated would be used in securities trading.

205.    Feldman bought Portola stock based on material nonpublic information that he received from Kaplan despite knowing, consciously avoiding knowing, or being reckless in not knowing, that the information was material and nonpublic. Feldman knew, consciously avoided knowing, or was reckless in not knowing that the material nonpublic information was disclosed in breach of a duty of trust and confidence for personal benefit. Feldman used this inside information in conducting his trades, and it was a significant factor in his decision to trade.

206.    Feldman unlawfully communicated to Feldman Relatives 1 and 2 and Colleagues 1-4 material nonpublic information that he received from Kaplan. Feldman also knew, consciously avoided knowing, or was reckless in not knowing that the information he communicated would be used in securities trading.

207.    Mendoza bought Portola stock based on material nonpublic information that he received from Cronin despite knowing, consciously avoiding knowing, or being reckless in not knowing, that the information was material and nonpublic. Mendoza knew, consciously avoided knowing, or was reckless in not knowing that the material nonpublic information was disclosed in breach of a duty of trust and confidence for personal benefit. Mendoza used this inside information in conducting his trades, and it was a significant factor in his decision to trade.

208.    Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

209.    By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**SECOND CLAIM FOR RELIEF**
**Violations of Exchange Act Section 14(e) and Rule 14e-3 thereunder**
**(ALL DEFENDANTS)**

210.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 193.

211.    Between at least April 8, 2020 and May 4, 2020, Alexion (the "offering person") took substantial steps to commence or did commence a tender offer for Portola's shares of stock but the proposed tender offer was not publicly announced during this time.

212.    Between at least April 8, 2020 and May 5, 2020, Defendants had material nonpublic information from Alexion relating to the tender offer Portola's shares, knew or had reason to know that this information was nonpublic; knew or had reason to know that this information was acquired directly or indirectly from (a) the offering person, (b) the issuer of the securities sought or to be sought by such tender offer, or (c) any officer, director, partner or

employee or any other person acting on behalf of such offering person or such issuer; and

purchased or sold, or caused to be purchased or sold, Portola's securities; and/or communicated

this material, nonpublic information to one or more persons under circumstances in which they

knew or it was reasonably foreseeable that such communication was likely to result in the

recipient's purchase or sale of Portola's securities before the tender offer was publicly

announced.

213.    By reason of the foregoing, Defendants have violated and, unless enjoined will

again violate, Exchange Act Section 14(e) [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17

C.F.R. § 240.14e-3].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final

Judgment:

### I.

Permanently enjoining Defendants and their agents, servants, employees and attorneys

and all persons in active concert or participation with any of them from violating, directly or

indirectly, Exchange Act Sections 10(b) and 14(e) [15 U.S.C. §§ 78j(b) and 78n(e)], and Rules

10b-5 and 14e-3 thereunder [17 C.F.R. §§ 240.10b-5 and 240.14e-3];

### II.

Ordering Cronin, Kaplan, Feldman and Mendoza to disgorge all ill-gotten gains they

received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged

violations, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C.

§§ 78u(d)(3), 78u(d)(5) and 78u(d)(7)];

**III.**

Ordering Defendants to pay civil monetary penalties under Exchange Act Section 21A(a)

[15 U.S.C. § 78u-1(a)];

**IV.**

Permanently prohibiting Defendants from serving as an officer or director of any

company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. §

78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)],

pursuant to Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and

**V.**

Granting any other and further relief this Court may deem just and proper.

**JURY DEMAND**

The Commission demands a trial by jury.

Dated:  New York, New York
        June 29, 2023

                            /s/ Antonia M. Apps
                    ANTONIA M. APPS
                    REGIONAL DIRECTOR
                    Thomas P. Smith, Jr.
                    Alison T. Conn
                    Margaret Spillane
                    Attorneys for Plaintiff
                    SECURITIES AND EXCHANGE COMMISSION
                    New York Regional Office
                    100 Pearl Street
                    Suite 20-100
                    New York, NY 10004-2616
                    (212) 336-0934 (Spillane)
                    spillanem@sec.gov